U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

SEP - 5 2023

TONY R. MOORE, CLERK
BY: _____
    DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 23-CR-00207 |
| | * | |
| VERSUS | * | DISTRICT JUDGE HICKS |
| | * | |
| DEMARKES GRANT | * | MAGISTRATE JUDGE HORNSBY |

**FACTUAL BASIS FOR PLEA**

Comes now the United States of America, by and through the undersigned Assistant United States Attorney and Trial Attorney, and DeMarkes Grant, by and through his undersigned counsel, who respectfully offer this "Factual Basis for Plea." This document is submitted so that the district court can determine that there is a factual basis for the plea, as required by FED. R. CRIM. P. 11(b)(3), and does not purport to set out every facet of the offense or every action taken by Grant in furtherance thereof. The parties agree that, if this case had proceeded to trial, the United States would have proven the following facts and many others beyond a reasonable doubt. The Defendant also agrees that these facts are true:

Beginning in 2017, DeMarkes Grant ("Grant") worked as a correctional officer at the DeSoto Parish Sheriff's Office ("DPSO") in Mansfield, Louisiana, in the Western District of Louisiana. As detailed below, while working at DPSO, Grant and another correctional officer repeatedly punched an arrestee, without justification. After the incident, Grant lied about the assault—a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the United States—in a written

report, with the intent to keep authorities from learning about the misconduct. Grant admits that his conduct violated 18 U.S.C. § 1519.

On September 27, 2019, Grant was working as a correctional officer at the DPSO jail when a Louisiana State Police trooper surrendered an arrestee, J.B., for booking. J.B. had been arrested for non-violent offenses. As part of the booking process, Grant brought J.B. to the jail's laundry room for a strip search. Another correctional officer, who was Grant's direct supervisor, Supervisor 1, joined Grant for the search. Both officers were much larger than J.B. The strip search initially proceeded without incident and did not raise any concern for Grant. The other officer, Supervisor 1, also did not mention having any concerns. But, after J.B. took off his clothing, the officers instructed J.B. to squat. While J.B. did squat multiple times, the squats did not fully comply with the officers' directions. As a result, the officers moved toward J.B., at which time J.B. nudged Grant and balled one of his fists.

In response, Grant grabbed J.B.'s arm, and Supervisor 1 began punching J.B., including in the head and face. Grant then also began punching J.B. After the officers had thrown dozens of punches at J.B., with Supervisor 1 throwing more of the punches, Grant swung J.B. to the ground, where J.B. bent over on his knees. Despite this clear opportunity to end the use of force, both officers hit J.B. again and watched as he covered his head and then attempted to stand. Both officers then pinned J.B. against a large laundry cart and dryer, and began to punch him again. After the officers repeatedly punched J.B., Grant pulled J.B. into the center of the laundry room, where Supervisor 1 swung at J.B. before pushing Grant and J.B. into

the corner of the room. With J.B. pinned in the corner, Supervisor 1 held J.B. while Grant positioned himself, pulled his arm back, and threw a punch into J.B.'s stomach. Supervisor 1 then also delivered an uppercut to J.B.'s face, causing J.B. to fall to the ground.

Although J.B. acted to defend himself during the assault, he did not pose a threat to either officer. In addition, the officers had opportunities to control J.B. and to end the use of force, but instead continued to punch J.B. Further, during the assault, both officers threw punches at J.B.'s head, which Grant understood to be lethal force. While Grant knew at the time that lethal force was only allowed to be used when he feared for his own life or someone else's, Grant was never afraid for anyone's life during the assault. Neither officer used the handcuffs or radio that were available to them in the laundry room, to assist in ending the use of force. And neither officer acted to stop the other officer's use of force.

Grant recognized in the moment that Supervisor 1's use of force was unjustified. In addition, Grant recognized in the moment that his own use of force violated his training because it was more force than was reasonably necessary to control the situation. During the assault, Grant set aside his training and entered fight mode. It appeared to Grant that Supervisor 1 had entered fight mode as well.

Following the assault, the officers escorted J.B. out of the laundry room without handcuffing him. During the escort, Grant observed that J.B. was visibly injured, including that his eye was swelling and he was bleeding from his mouth. Grant thought that J.B. did not look good. Despite observing that J.B. was injured

3

and knowing that J.B. had suffered significant blows to his head, and despite the fact that the officers had thrown approximately 50 punches at J.B., Grant does not recall any effort by either officer to obtain medical care for J.B. Instead, the jail's warden acted to obtain medical care for J.B., by calling EMS for assistance approximately 40 minutes after the assault. EMS brought J.B. to the hospital for treatment, and despite just having assaulted J.B., Grant accompanied J.B. to the hospital. While at the hospital, Grant acknowledged that J.B. had been in an altercation at the jail but Grant did not admit his own involvement in that altercation. Grant also did not inform any medical professional that J.B. had been punched dozens of times in the head and body. At the hospital, J.B. was diagnosed with a broken eye socket and broken nose, among other injuries.

Following these events, Grant wrote a report concerning the incident that misrepresented J.B.'s conduct; minimized the severity of the officers' uses of force; and omitted the fact that both officers' uses of force had been unjustified and unreasonable, among other falsehoods. Grant knew that he was required to report the incident fully and truthfully in his report, but knowingly and purposefully lied in his report to prevent authorities from learning about the assault, a matter within the jurisdiction of the FBI. Grant also provided a copy of his report to Supervisor 1, allowing Supervisor 1 to copy and promote Grant's false narrative.

\*   \*   \*

Wherefore, the parties signing below agree and stipulate that the preceding paragraphs adequately describe Grant's role in the offense of Falsification of Records,

establishing his guilt beyond a reasonable doubt to Count 1 of the Bill of Information in this case.

Signed this 25 day of August, 2023.

*signature*
DEMARKES GRANT
Defendant

*signature*
ALEX WASHINGTON
Attorney for the Defendant

BRANDON B. BROWN
United States Attorney

By: *signature*
SETH D. REEG, La. Bar No. 34184
Assistant United States Attorney

KRISTEN CLARKE
United States Assistant Attorney General

By: *signature*
ERIN MONJU, N.Y. Bar No. 5160908
Trial Attorney